IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

      Plaintiff,

                            CIVIL ACTION NO.

v.                      1:10-cv-2816-JEC

ECKERD CORPORATION d/b/a RITE
AID,

      Defendant.

## ORDER AND OPINION

This case is before the Court on defendant's Motion for Summary Judgment [49] and the EEOC's Motion for Partial Summary Judgment [53]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant's Motion for Summary Judgment [49] should be **GRANTED** and the EEOC's Motion for Partial Summary Judgment [53] should be **DENIED**.

## BACKGROUND

This is a disability discrimination case. (Compl. [1].) Charging party Fern Strickland began working as a cashier at Eckerd's Holcomb Bridge store in 1992. (Def.'s Statement of Material Facts ("DSMF") [49] at ¶ 11.) In 2000, Strickland transferred to Eckerd's Jones Bridge store, where she continued to work as a cashier. (*Id*. at

¶ 12.)   Defendant Rite Aid acquired the Jones Bridge store when it purchased the Eckerd Corporation in June, 2007.  (*Id.* at ¶¶ 1-2.) Strickland worked as a cashier for the Jones Bridge Rite Aid from the date of the acquisition until she was terminated on January 29, 2009. (*Id.* at ¶ 170.)

Strickland was diagnosed with osteoarthritis in both of her knees in June, 2001.  (Pl.'s Statement of Material Facts ("PSMF") [53] at ¶ 8.)   Strickland's condition made it difficult for her to walk without the assistance of a cane or to stand for prolonged periods of time.  (*Id.* at ¶¶ 9-11.)  At some point in 2001, Strickland began intermittently sitting in a chair at work to relieve pain in her knees.  (*Id.* at ¶ 11.)  Strickland had knee replacement surgery in her right knee in 2006, but her knee pain persisted and she continued to use the chair at work.  (*Id.* at ¶¶ 9-12, 19-20.)

In March, 2008, Larry Frisbie became the district manager of the Jones Bridge Rite Aid.  (PSMF [53] at ¶ 13.)  Several months later, Frisbie and Human Resources Manager Linda Sheffield visited the Jones Bridge store and observed Strickland sitting in a plastic lawn chair behind the counter.  (*Id.* at ¶ 16 and DSMF [49] at ¶ 102.)  Sheffield was perplexed by this observation, as Rite Aid generally does not permit cashiers to sit while they are on duty and she had never seen a cashier sitting in this manner.  (DSMF [49] at ¶¶ 31, 103.) According to Frisbie, cashiers are required to productively work on

the sales floor stocking, cleaning and performing other housekeeping and general store duties when they do not have a customer at the register. (*Id.* at ¶ 31.)

When Frisbie and Sheffield asked Strickland why she was sitting behind the counter, Strickland informed them that she had provided Rite Aid a doctor's note concerning her need to use the chair at work. (PSMF [53] at ¶ 17.)  Following the store visit, Sheffield checked Strickland's file for a doctor's note and found one from January, 2007. (*Id.* at ¶ 18.)  The note stated that Strickland "requires a stool or chair to sit in at work . . . throughout the day, and most of the day due to severe arthritic symptoms." (*Id.* at ¶ 19.)  After reviewing the note and speaking with Strickland, Sheffield determined that she needed more information about Strickland's limitations, as well as her work habits and ability to meet the requirements of the cashier position. (DSMF [49] at ¶¶ 108, 110.)

Upon further investigation, Sheffield was informed by the store manager, Robin Jean, that Strickland had been permitted to sit intermittently and at her discretion for several years due to her arthritic symptoms. (*Id.* at ¶ 111.)  However, Sheffield did not find any evidence that Eckerd or Rite Aid had ever formally approved a sitting accommodation for Strickland. (*Id.* at ¶ 113.)  Moreover, Sheffield surmised from her interview with Jean that Strickland's

AO 72A
(Rev.8/82)

frequent sitting was causing productivity and personnel problems for the Jones Bridge store.[1] (*Id.* at ¶¶ 115-117.)

Based on her preliminary inquiries, Sheffield concluded that the 2007 doctor's note was outdated and vague concerning Strickland's precise limitations. (*Id.* at ¶ 118.) Accordingly, Sheffield requested an updated and more specific doctor's note regarding Strickland's medical restrictions. (DSMF [49] at ¶ 119.) Per Sheffield's request, Strickland provided a doctor's note in December, 2008 stating that she "requires a chair at checkout and limited to 15 minutes or less at a time due to osteoarthritis." (*Id.* at ¶ 120.) In an accompanying handwritten note, Strickland indicated that "Dr. Ellis's nurse 'Allison'" could provide more information if necessary. (*Id.* at ¶ 121.)

In addition to requesting an updated doctor's note, Sheffield asked Rite Aid Loss Prevention Manager Gibson to review security surveillance tapes over the register to determine how much time Strickland spent sitting idly and how much time she spent working productively. (*Id.* at ¶ 122.) By mid-January, 2009, Gibson had

---

[1] The EEOC denies that Strickland was unproductive and points out that she never was disciplined or counseled on the issue. (Pl.'s Resp. to DSMF [70] at ¶¶ 115-117.) However, the EEOC concedes that Jean informed Sheffield that Strickland's sitting interfered with her ability to do a sufficient amount of cashiering work, increased the workload of other employees, and was one of the reasons the store was not meeting company standards. (*Id.*)

reviewed four days of video footage from the first week of January, 2009. (*Id.* at ¶ 124.) He reported to Sheffield that, on those four days, Strickland was sitting down idly for about half of her shift. (DSMF [49] at ¶ 124.) A loss prevention associate, Scott Gloede, reviewed two additional days of tape and reported similar findings. (*Id.* at ¶ 127.)

After reviewing the updated doctor's note and the loss prevention reports, Sheffield determined that she and Frisbie needed to meet with Strickland to determine whether they could find an appropriate accommodation for her. (*Id.* at ¶ 131.) They scheduled a meeting with Strickland on January 15, 2009. (*Id.* at ¶ 133.) The stated purpose of the meeting was for Sheffield and Frisbie to engage in an interactive dialogue with Strickland so that they could better understand her restrictions and try to identify reasonable accommodations. (*Id.*)

The January 15 meeting occurred as planned. (PSMF [53] at ¶ 23.) During the meeting, Sheffield and Frisbie advised Strickland that they had received an updated doctor's note, but that the note still was unclear about Strickland's limitations. (DSMF [49] at ¶¶ 135, 142.) They also informed Strickland about the results of the loss prevention surveillance review indicating that Strickland was sitting down idly for about half of her shift. (*Id.* at ¶ 138.) At some point in the meeting, Sheffield and Frisbie asked Strickland about the permanency

5

of her requested sitting accommodation.  (*Id.* at ¶ 137.)  Strickland responded that she would likely need the accommodation forever.  (*Id.*)

Shortly after the January 15 meeting, Strickland provided Sheffield and Frisbie a new note from her doctor stating that she "needs to sit at least 30 minutes per hour worked throughout the work day."  (*Id.* at ¶ 145.)  The new note was consistent with the amount of time that Strickland had been observed to be sitting idly on video surveillance tapes.  (DSMF [49] at ¶¶ 124, 127.)  However, the note did not provide a rationale for the half-time sitting restriction or a more specific assessment of Strickland's limitations, as requested by Sheffield and Frisbie.  (*Id.* at ¶ 147.)  Based on their most recent discussions with Strickland and the new doctor's note, Sheffield and Frisbie concluded that they still needed more information about Strickland's restrictions and needs to  identify a reasonable accommodation.  (*Id.* at ¶ 148.)

On January 19, 2009, Sheffield faxed a written cashier job description to Dr. Ellis and asked him to review it to ensure that Strickland was medically capable of performing the essential functions of the job.  (*Id.* at ¶ 149.)  The purpose of Sheffield's request was to determine whether Strickland's doctor could recommend any accommodation other than the "very restrictive 50% sitting accommodation" requested by Strickland and indicated by the doctor's most recent note.  (Pl.'s Resp. to DSMF [70] at ¶¶ 150-152.)  Dr.

6

Ellis never responded to Sheffield's job description inquiry. (*Id*. at ¶¶ 155-156.) Strickland admits that she never asked Dr. Ellis to provide the requested information nor otherwise followed up to see if he had responded to Sheffield's inquiry. (*Id*. at ¶¶ 158-159.)

Within the next several days, Sheffield concluded that Rite Aid could not provide Strickland with the sitting accommodation that she had requested. (PSMF [53] at ¶¶ 29.) Frisbie, as well as Sheffield's direct supervisor Ron Seitler, concurred. (*Id*. at ¶ 30.) Frisbie and Sheffield met with Strickland on January 29, 2009 to tell her that Rite Aid would not allow her to sit for half of each hour that she worked. (*Id*. at ¶ 32.) Per Sheffield's recommendation and accommodation decision, Strickland was not permitted to continue working on January 29. (*Id*. at ¶ 34 and Def.'s Resp. to PSMF [71] at ¶ 34.) A termination form dated February 26, 2009 reflects that Strickland's employment at Rite Aid was terminated effective January 29, 2009, the last day Strickland worked. (DSMF [49] at ¶ 170.)

Following her termination, Strickland filed a charge of discrimination with the EEOC alleging violations of the ADA. (Compl. [1] at ¶ 7.) The EEOC subsequently filed this action on Strickland's behalf. (*Id*. at ¶ 3.) In its complaint, the EEOC asserts that defendant failed to provide Strickland a reasonable accommodation for her disability, and then terminated Strickland on account of her disability, in violation of the ADA. (*Id*. at ¶ 8.) The EEOC seeks

7

permanent injunctive relief against defendant, as well as compensatory and punitive damages for Strickland. (*Id.* at 5-7.)  The parties have filed cross-motions for summary judgment on the ADA claim, which are now before the Court.  (Def.'s Mot. for Summ. J. [49] and Pl.'s Mot. for Partial Summ. J. [53].)

**DISCUSSION**

**I.    Summary Judgment Standard**

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  A fact's materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Id.* at 249-50.

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits.  Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In such a situation, there can be "'no genuine issue as to

8

any material fact'" because "a complete failure of proof concerning an essential element of the non[-]moving party's case necessarily renders all other facts immaterial." *Id.* at 322-23 (quoting FED. R. CIV. P. 56(c)).

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323. However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the non[-]moving party's case." *Id.* at 325. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. The court must view all evidence and factual inferences in a light most favorable to the non-moving party. *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48 (1986). The requirement is that there be "no *genuine* issue of *material* fact." *Id.*

## II.   Disability Discrimination

The ADA prohibits discrimination against a "qualified individual" with a disability with respect to any term, condition or privilege of

AO 72A
(Rev.8/82)

employment.  42 U.S.C. § 12112(a) and *D'Angelo v. ConAgra Foods, Inc.,* 422 F.3d 1220, 1227 (11th Cir. 2005)(discussing the purpose of the ADA).  Under the ADA, discrimination includes the failure to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual.  42 U.S.C. § 12112(b)(5)(A) and *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1255 (11th Cir. 2001)(addressing an ADA accommodation claim).  Thus, there are two distinct categories of disability discrimination claims under the ADA: (1) failure to accommodate and (2) disparate treatment.  *Basith v. Cook Cnty.,* 241 F.3d 919, 927 (7th Cir. 2001).  The EEOC asserts both types of claims in its complaint.  (Compl. [1] at ¶ 8.)

### A.    Reasonable Accommodation

To prevail on its accommodation claim, the EEOC must prove that Strickland has a disability and that she is qualified for the Rite Aid cashier position.  *Davis v. Florida Power & Light Co.,* 205 F.3d 1301, 1305 (11th Cir. 2000).  In addition, the EEOC must demonstrate that defendant failed to provide a reasonable accommodation for Strickland's disability.  *Lucas,* 257 F.3d at 1255.  *See also Nadler v. Harvey,* No. 06-12692, 2007 WL 2404705, at *5 (11th Cir. 2007)(describing the evidentiary framework applicable to an ADA accommodation claim).  Assuming these requirements are met, defendant can avoid liability under the ADA by showing that Strickland's

10

accommodation would impose an "undue hardship" on its business or operations.   42 U.S.C. § 12112(b)(5)(A).

For purposes of summary judgment, defendant assumes that Strickland is disabled as a result of her osteoarthritis. (Def.'s Br. in Supp. of Summ. J. ("Def.'s Br.") [49] at 3.)   However, defendant contends that Strickland is not a "qualified individual" because she cannot perform the essential functions of the cashier job with or without a reasonable accommodation. (*Id.* at 3-10.)   Defendant further contends that Strickland's requested accommodation of sitting for half of every hour that she works would impose an undue hardship on its business. (*Id.* at 10-13.)   The undisputed evidence in the record supports both of those arguments.

> 1.   <u>Strickland is not a "qualified individual."</u>

A disabled individual is "qualified" under the ADA if she can perform the "essential functions" of her job "with or without a reasonable accommodation." *Wood v. Green,* 323 F.3d 1309, 1312 (11th Cir. 2003).   The essential functions of a job include the fundamental, but not the marginal, duties of the position. *Lucas,* 257 F.3d at 1258 and 29 C.F.R. § 1630.2(n)(1).   To determine whether a particular duty is an essential function, the Court must consider the employer's judgment, as well as any written job descriptions.   *Id.*   Other important factors are:  (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring an

11

employee to perform the function, (3) the work experience of employees in similar jobs, and (4) the number of employees among whom the function can be distributed. *Davis,* 205 F.3d at 1305 and 29 C.F.R. § 1630.2(n)(2)(ii) and (3).

Applying the relevant factors, there is no question that the cashier job at issue here has significant physical requirements. (DSMF [49] at ¶¶ 28-52.) Defendant's written job description for the cashier position includes several customer service and housekeeping duties that are physically demanding, including unloading merchandise, stocking shelves and end-caps, building merchandise displays, and ensuring that the store is always clean and visually pleasing. (*Id.* at ¶ 28.) To accomplish those duties, the job description specifies that cashiers must be able, among other things, to: (1) regularly stand dynamically for long periods of time without a break, (2) regularly walk about, (3) occasionally stand statically for long periods of time without a break, and (4) occasionally lift and carry up to fifty pounds. (*Id.* at ¶ 29.)

Consistent with the written job description, store manager Jean and district manager Frisbie testified that cashiers are expected to productively work on the sales floor, rather than sit idly, when they do not have a customer at the register. (*Id.* at ¶¶ 30-31.) According to Frisbie, cashiers spend much of their time at work walking customers to a department, cleaning, stocking shelves, unloading

12

trucks, implementing price changes and performing other inventory duties throughout the store. (*Id.* at ¶¶ 31, 40.) For that reason, cashiers are not permitted to sit while on duty. (DSMF [49] at ¶¶ 31, 51.) Rather, they are expected to stay busy doing tasks that generally require movement around the store. (*Id.* at ¶¶ 43, 52.)

Crediting Strickland's testimony and her doctor's assessments, Strickland does not meet the physical requirements described in the written job description, and cannot perform many of the tasks identified by her employer as essential, without an accommodation. Strickland testified that her osteoarthritis makes it difficult for her to walk unassisted and limits her ability to stand for long periods of time without a break. (PSMF [53] at ¶¶ 10-11.) Dr. Ellis confirmed in two separate assessments that Strickland needs to sit in a chair "most of the day" or "at least 30 minutes per hour worked" throughout the day. (*Id.* at ¶¶ 19, 25.) In addition, Strickland testified that she is unable to do the lifting and carrying necessary to assist with truck unloads. (Strickland Dep. at 150.)

The determinative question is whether Strickland can perform the functions described above with a reasonable accommodation. *Lucas,* 257 F.3d at 1255-56. An ADA plaintiff has the burden of identifying a reasonable accommodation and demonstrating that it would enable her to perform the essential functions of her job. *Id.* and *Terrell v. USAir,* 132 F.3d 621, 624 (11th Cir. 1998) ("'[T]he burden of identifying an

13

accommodation that would allow a qualified individual to perform the job rests with that individual'") (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1286 (11th Cir. 1997)).   The EEOC has not met that burden with respect to Strickland.

The only accommodation that Strickland ever identified was to be allowed to sit in a chair for at least half of her work day.[2]  (DSMF [49] at ¶¶ 145-146, 160.)  The EEOC does not explain how sitting idly for half of the work day would enable Strickland to: (1) work productively on the sales floor when there is not a customer at the register, or (2) meet the physical demands required to assist with truck unloads and perform regular stocking, cleaning and inventory related duties.  (*Id.* at ¶¶ 28-53.)  In fact, the sitting accommodation would simply eliminate, rather than enable Strickland to perform, many of the essential functions of the cashier job.  (*Id.*)  It is therefore per se unreasonable.  *Lucas,* 257 F.3d at 1255.

The EEOC argues that the accommodation is nevertheless required by the ADA because Strickland was allowed to sit for the last eight years of her employment without incident.  (Pl.'s Resp. [68] at 4-5.)  Defendant concedes that Strickland began using a chair intermittently at work in 2002.  (Def.'s Resp. to PSMF [75] at ¶ 3.)  However, during

---

[2]   The EEOC contends that Strickland "never refused to discuss" other potential accommodations, but it is undisputed that Strickland failed to request or identify any alternative to the sitting arrangement.  (Pl.'s Resp. to DSMF [70] at ¶¶ 137-143, 160.)

14

the first five years that Strickland was allowed to sit her store was operating as an Eckerd, rather than as a Rite Aid. (*Id.*)  When Rite Aid purchased Eckerd in 2007, it reduced the payroll budget and correspondingly increased the expectations of its cashiers. (DSMF [49] at ¶¶ 5-10.)  Assuming that the sitting accommodation was reasonable for an Eckerd cashier, it was not necessarily feasible once the store became a Rite Aid, as evidenced by the fact that Frisbie and Sheffield began questioning Strickland about her sitting within about a year of the acquisition. (*Id.* at ¶¶ 96-108.)

In any case, it is well-settled that an employer's previous willingness to provide a certain accommodation does not establish that the accommodation is reasonable or required. *Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1528 (11th Cir. 1997)(affirming summary judgment on an accommodation claim, although the employer provided the requested accommodation "for quite some time" and "with relatively minor disruption or inconvenience").  As the Eleventh Circuit explained in *Holbrook*:

> We do not seek to discourage other employers from undertaking the kinds of accommodations of a disabled employee as those performed by [the employer in this case]; indeed, it seems likely that the [employer] retained a productive and highly competent employee based partly on its willingness to make such accommodations.  However, we cannot say that [the employer's] decision to cease making those accommodations that pertained to the essential functions of [the disabled employee's] job was violative of the ADA.

AO 72A
(Rev.8/82)

*Id.   See also Webb v. Donley,* 347 Fed. App'x 443, 446 (11th Cir. 2009)("the fact that an employer previously has granted a requested accommodation does not render that accommodation reasonable").

In a related argument, the EEOC contends that the functions that Strickland is unable to perform are not essential because she was not personally asked to do them during the last several years of her employment. (Pl.'s Resp. [68] at 6-8.)  On this point, store manager Jean testified that she exempted Strickland from any physically demanding tasks and that she allowed Strickland to sit frequently during the work day. (Def.'s Resp. to PSMF [75] at ¶¶ 31-36, 45.) However, Jean stated that she took this action in an attempt to accommodate Strickland's limitations and restrictions. (*Id.*) As with any other type of voluntary accommodation, an employer does not concede that a job function is unessential by temporarily removing the function from a disabled employee's duties. *Holbrook,* 112 F.3d at 1528. *See also Nadler,* 2007 WL 2404705, at *7 (an employer's past tolerance of tardiness does not negate evidence that punctuality is an essential function).

Finally, the EEOC suggests that defendant is liable under the ADA as a result of its failure to discuss alternative accommodations that might have enabled Strickland to perform the essential functions of her job. (Pl.'s Resp. [68] at 14-17.) The ADA regulations provide that, in order to determine the appropriate reasonable accommodation:

16

> it may be necessary for an employer "to initiate an informal, interactive process with the individual with a disability in need of an accommodation" to identify the person's limitations and possible accommodations.

*Knowles v. Sheriff,* 460 Fed. App'x 833, 835 (11th Cir. 2012)(quoting 29 C.F.R. § 1630.2(o)(3)). According to the EEOC, defendant did not engage in the required interactive process in good faith and consequently failed to consider the full range of potential accommodations for Strickland. (*Id.*)

Te Eleventh Circuit has held that an employer has no affirmative duty even to engage in an interactive process where the disabled employee fails to identify a reasonable accommodation. *Id.* (citing *Earl v. Mervyns, Inc.,* 207 F.3d 1361, 1367 (11th Cir. 2000)). As discussed, the only accommodation that Strickland identified during her employment with defendant is per se unreasonable. Even now, neither Strickland nor the EEOC can point to any accommodation that would enable Strickland to perform the essential functions of the cashier job. Given Strickland's acknowledged physical limitations, it is doubtful that any such accommodation exists. (Strickland Dep. at 148-150.)

Moreover, and to the extent that the ADA required an interactive process in this case, defendant clearly met its burden in that regard. It is undisputed that Frisbie and Sheffield conducted an investigation during which they gathered information from various sources concerning

17

Strickland's condition, her work habits, and her ability to perform the cashier job in spite of her physical limitations. (DSMF [49] at ¶¶ 108-131.) They subsequently met with Strickland several times, at least once with the express purpose of identifying and discussing potential accommodations. (*Id*. at ¶¶ 131-133.) Having fully engaged in a dialogue with Strickland about her limitations and ability to be accommodated, defendant is not liable under the ADA for failing to consider accommodations that Strickland herself never identified or requested. *See Stewart,* 117 F.3d at 1287 (liability does not arise under the ADA where an employer engages in an interactive process and makes reasonable efforts to communicate with a disabled employee).

The sitting accommodation requested by Strickland is not only unreasonable, it is patently incompatible with the essential functions of the cashier job as identified by defendant's management and routinely performed by every other cashier except Strickland. (DSMF [49] at ¶¶ 28-52.) It is undisputed that Strickland never identified an alternative reasonable accommodation, and there is no indication that such an accommodation exists. Accordingly, Strickland is not a "qualified individual" under the ADA. *Davis,* 205 F.3d at 1305 (an employee who is unable to do the essential functions of his job with or without accommodation is by definition not a "qualified individual") and *Lucas,* 257 F.3d at 1255 (holding same). Defendant's motion for summary judgment [49] on the EEOC's accommodation claim is

18

therefore **GRANTED** and the EEOC's motion for partial summary judgment [53] on the "qualified individual" prong is **DENIED**.

2.   <u>The requested accommodation is an undue hardship.</u>

An accommodation is an undue hardship when it can only be accomplished with "significant difficulty or expense" to the employer. 42 U.S.C. § 12111(10)(A).   To determine whether that is the case, the Court considers several factors, including the nature and cost of the accommodation and its impact on an employer's operations and workforce.   *Id.* at § 12111(10)(B).   Accommodations that result in other employees having to work harder or longer are often denied on the ground of undue hardship.   *See Dey v. Milwaukee Forge,* 957 F. Supp. 1043, 1052 (E.D. Wis. 1996)("An accommodation that would result in other employees having to work harder or longer is not required under the ADA.") and *Pate v. Baker Tanks Gulf S., Inc.,* 34 F. Supp. 2d 411, 417 (W.D. La. 1999)(holding same).

The EEOC acknowledges that Rite Aid operates on a lean staffing model.   (DSMF [49] at ¶¶ 5-9.)   There are generally only one or two cashiers and a store manager or other supervisor on duty during any given shift.   (*Id.* at ¶ 7.)   In addition to checking out customers at the register, cashiers are responsible for a number of other customer service and housekeeping duties, including unloading merchandise, stocking shelves, cleaning, working in the photo lab, and assisting customers with their shopping needs.   (*Id.* at ¶¶ 8-9, 30-52.)   To

19

fulfill those duties, cashiers are expected to productively work on the sales floor any time they do not have a customer at the register. (*Id.* at ¶¶ 31-32, 52.)

Given defendant's business model, having a cashier sit idly for half of her shift would necessarily cause productively and morale issues.  (*Id.* at ¶¶ 31-32, 51.)  And in fact, there is undisputed evidence that Strickland's sitting interfered with defendant's operations in a number of ways.  Strickland admits that she: (1) did not work in the photo lab, (2) only mopped the floor two or three times during her entire Eckerd/Rite Aid employment, and (3) helped stock only a small fraction of the store.  (Strickland Dep. at 103, 121-125, 165, 189-196.)  Store manager Jean and shift supervisor Stacie Broussard testified that other Rite Aid employees became frustrated by Strickland's low productivity.  (DSMF [49] at ¶¶ 81-87.) During the accommodation investigation, Jean informed Sheffield more generally that Strickland's sitting was one of the reasons she was struggling to maintain company standards at the store, and that other employees in the store were having to assume Strickland's duties. (*Id.* at ¶¶ 116-117.)

The EEOC counters that the sitting accommodation is essentially cost-free because Strickland purchased her own chair, and that defendant can easily absorb any impact associated with the accommodation because it is a large corporation with over 4,700 stores

20

and 80,000 employees.  (Pl.'s Resp. [68] at 9-10.)  These arguments fail to account for the true cost of the accommodation and its impact on the particular store where Strickland worked.  Every employee, including Strickland, testified that the cashier job requires frequent movement throughout the store in order to accomplish a variety of tasks that are essential to the operations of the store.  (DSMF [49] at ¶¶ 31-51.)  At any given time, there are only one or two cashiers who are available to perform the required work.  (*Id*. at ¶ 7.)  While Strickland is sitting, the work is either being done solely by one person or not being done at all.  Defendant's size does not ameliorate the impact of that arrangement on the productivity and morale of the Jones Bridge store.                    Specifically addressing Strickland's productivity, the EEOC attributes any problems to defendant's failure to properly manage and supervise Strickland rather than the sitting accommodation.  (Pl.'s Resp. [68] at 11-13.)  According to the EEOC, Strickland could productively work with the sitting accommodation if defendant's management merely assigned more work to her.  (*Id*. at 13.)  But again, most of the tasks that could be assigned to Strickland require movement throughout the store.  (DSMF [49] at ¶¶ 31-51.)  Assuming that Strickland must sit for half of every hour that she works, it is unreasonable to expect that additional assignments would improve her productivity.

21

As indicated above, Strickland's requested sitting accommodation is inconsistent with many of the essential functions of the cashier position, and with the general expectation that cashiers work productively on the sales floor when they do not have a customer at the register. (*Id.*) Providing the accommodation essentially requires that defendant pay Strickland for twice the hours that she actually works while assigning many of her responsibilities to other employees. (*Id.*) As such, the accommodation meets the definition of "undue hardship" under the ADA. 42 U.S.C. § 12111(10)(A). *See also Dey,* 957 F. Supp. at 1052 and *Pate,* 34 F. Supp. 2d at 417. For this additional reason, the Court **GRANTS** defendant's motion for summary judgment [49] on plaintiff's accommodation claim and **DENIES** the EEOC's motion for summary judgment [53] on the undue hardship issue.

### B.   Disparate Treatment

The *McDonnell Douglas* burden shifting framework is applicable to the EEOC's disparate treatment claim.[3] *See Collado v. United Parcel Serv. Co.,* 419 F.3d 1143, 1149-1150 (11th Cir. 2005) (applying *McDonnell Douglas* to an ADA case involving circumstantial evidence). Under this framework, the EEOC initially has the burden of

---

[3] The *McDonnell Douglas* framework is inapplicable to the EEOC's accommodation claim because that claim does not require an inquiry into the subjective issue of defendant's motivation and intent. *Nadler,* 2007 WL 2404705, at *8-9 and *Wright v. Hosp. Auth. of Houston Cnty.,* 2009 WL 274148, at *7 (M.D. Ga. 2009)(applying *Nadler*).

establishing a *prima facie* case of disability discrimination. *Cleveland v. Home Shopping Network, Inc.,* 369 F.3d 1189, 1193 (11th Cir. 2004) (citing *Wascura v. City of S. Miami,* 257 F.3d 1238, 1242 (11th Cir. 2001)).  Assuming the EEOC is successful, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment decision, in this case Strickland's termination.  *Id.*  To survive summary judgment, the EEOC must then produce some evidence that defendant's articulated reason is "unworthy of credence" and a pretext for discrimination.  *Id.*

To establish a *prima facie* case of discrimination under the ADA, the EEOC must at the very least show that Strickland (1) has a disability and (2) is "qualified" for her position.  *Carruthers v. BSA Adver., Inc.,* 357 F.3d 1213, 1215 (11th Cir. 2004).  Pursuant to the above analysis, the EEOC cannot make out a *prima facie* case of disability discrimination here because Strickland is not "qualified" for her job.  That is, the EEOC has presented no evidence that Strickland can perform all of the essential functions of the job with or without a reasonable accommodation.  *See Lucas,* 257 F.3d at 1255 and *Davis,* 205 F.3d at 1305.  Accordingly, the Court **GRANTS** defendant's motion for summary judgment [49] on the EEOC's disparate treatment claim.

Moreover, the undisputed evidence shows that defendant terminated Strickland because she was unable to do the essential functions of the

cashier job. *See Quitto v. Bay Colony Golf Club, Inc.,* No. 2:06-cv-286-FtM-29DNF, 2007 WL 2002537, at *10 (M.D. Fla. 2007)(an employer had a legitimate, nondiscriminatory reason for terminating a disabled employee who could no longer perform the essential functions of his job) and *White v. Georgia Dep't of Motor Vehicle Safety,* No. Civ. A. 104CV0790JOF, 2006 WL 89856, at *7 (N.D. Ga. 2006)(Forrester, J.) (the inability to perform an essential job function is a legitimate, nondiscriminatory reason for termination). Specifically, defendant terminated Strickland as a result of its determination that Strickland has a permanent medical need to sit for at least half of every hour that she works, but that she cannot perform the essential functions of the cashier job while she is seated. (DSMF [49] at ¶¶ 115-117, 131-135 and 161-164.) The EEOC does not present any evidence of pretext to rebut defendant's legitimate reason for terminating Strickland. Accordingly, and for this additional reason, defendant's motion for summary judgment [49] on the EEOC's disparate impact claim is **GRANTED**.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendant's Motion for Summary Judgment [49] and **DENIES** the EEOC's Motion for Partial Summary Judgment [53]. The clerk is directed to **CLOSE** this case.

24

SO ORDERED, this <u>1st</u> day of July, 2012.

<u>/s/ Julie E. Carnes</u>
JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)